## McCloskey Estate

*William F. Donatelli*, for appellant.

*Harvey E. Schauffler*, for appellee.

BOYLE, P. J., February 1, 1956.—The appeal of Victoria McCloskey, mother of the decedent, from the decree of the register of wills admitting to probate a paper writing purporting to be the decedent's last will and testament, presents two questions:

1. When the testimony in support of the appeal admits of a finding that decedent's sister, who is the proponent and sole beneficiary of the will, falsely represented to decedent that his will in her possession had been destroyed in a fire and that decedent relied thereon, believing that he would die intestate leaving his mother as his only heir, does such false and fraudulent conduct of the proponent effect a revocation of the will and, if the testimony in the record shows a

substantial dispute on this question, should an issue be awarded to try the same by jury?

2. If the alleged fraudulent conduct of the proponent of the will does not effect a revocation of the will under the provisions of section 5 of the Wills Act of April 24, 1947, P. L. 89, 20 PS §180.5, should not the court reserve the question as to whether the proponent, sole beneficiary and executrix of the will, is a trustee ex maleficio for the benefit of the appellant, to be determined at the time of the audit of the personal representative's final account with immediate provision for the securing of the assets of the estate by the entry of a bond with surety or by other proceedings?

It is now conceded by the parties that decedent's last family or principal residence was in Allegheny County, Pa., and any dispute as to that question has been withdrawn.

Before entering the military service of the United States in August 1942, decedent, Edward S. McCloskey, had lived for a number of years in the home of his sister, Mrs. Helen Majzer, in Glassport, Allegheny County, Pa. Mrs. Majzer is the proponent of the will in question in the case at bar. In August 1942, her household consisted of herself, her husband, two children, her mother, sister and decedent. The mother, Mrs. Victoria McCloskey, is the appellant herein. She and her daughter, Mrs. Kveder, moved to Vestaburg, Washington County, Pa., in the latter part of 1942. On November 2, 1943, Edward McCloskey, decedent, signed a paper writing which purports to be his last will and testament. He was then on active military duty with the Army of the United States and was stationed at an Army Air Base at Lincoln, Nebraska. The will was made on a mimeographed form provided by the Army. This will gives all his estate to his sister, Mrs. Majzer, the proponent, who is also appointed executrix. He sent the will home to his sister, Mrs.

Majzer, for safekeeping along with other papers, including an insurance policy and a power of attorney. Upon his return from the war in 1945, decedent did not go to live at the home of his sister, Mrs. Majzer, in Glassport, but took up residence in an apartment in McKeesport, Allegheny County, Pa. His place of employment after the war was at the Irvin Works of the United States Steel Corporation. The testimony shows that after 1945 he visited his mother, the appellant, in Vestaburg, Washington County, Pa., at least once a week and frequently stayed at her home over weekends. It also appears that his visits to Mrs. Majzer's home in Glassport were "about once a month".

There is testimony to the effect that Edward McCloskey did not return to Mrs. Majzer's home after the war because of ill-feeling which had developed between them arising out of her alleged failure to return to decedent the sum of $400 which he had sent to her while he was in military service and because of letters (which were not produced as evidence) written by Mrs. Majzer to decedent stating that she wished "that he would never come back again". The testimony offered by the proponent denies the alleged ill-feeling between her and decedent; denies that the letters referred to were ever written by her to decedent; and states that the aforesaid sum of $400 was returned by proponent to decedent at his request during the war while he was stationed at Reno, Nev. The proponent also offered testimony to show that the reason decedent did not return to her home to live with her and her family after the war was because of her limited quarters which consisted then only of a basement foundation with no superstructure, the said basement being occupied by proponent, her husband Joseph, who was ill, and their, then, five children. Proponent's testimony is to the effect that decedent was frequently at her home after his discharge from mili-

tary service and that there was no ill-feeling between them except on the occasion when decedent criticized proponent's husband for not working when, in fact, he was ill from the disease of which he later died. The testimony is that decedent apologized for his action in this regard and that a friendly relationship was restored. At this point, reference should be made to appellant's exhibit "I" which is a letter dated February 4, 1952, from proponent, Mrs. Majzer, to her sister, Mrs. Virginia Kveder, who is a witness for the appellant. This letter contains vulgar and unfriendly references to decedent, of which an example is the following:

". . . Well I don't want to ever know the pig, (referring to decedent) I hope even when he dies that I won't know him, he might Just as well be a pig he has no religion or fate so when he dies he be out on the outside of the fence All he cares about is women & wine & live like a pig. . . ."

The significant fact in the case at bar which underlies the alleged fraud committed by proponent on decedent arises out of the fire which occurred in her home in September 1951, causing the uncompleted frame superstructure of the house to be destroyed. It is charged by Mrs. McCloskey, appellant, that proponent fraudulently represented to decedent that his will and other papers had been destroyed in the fire, that he relied upon this false statement and believed that his mother, appellant, would inherit all his estate as his heir at law under the intestate laws. It is conceded that the proponent kept the will and other papers of the decedent in a cedar chest in the Majzer family living quarters. Mrs. Virginia Kveder, a sister of the proponent, was called as a witness for appellant. She testified in part that, after the fire, proponent came to her mother's home in Vestaburg to borrow money with which to repair the damaged residence. At this

time, appellant, proponent, decedent and Mrs. Kveder were present. Concerning this incident, Mrs. Kveder testified, in part, as follows:

"Q. And was there any conversation or discussion between Helen and Edward, your brother, about this money?

"A. Yes.

"Q. Will you tell us what that conversation was about?

"A. Well, Ed told— . . .

"Well, Ed told my mother not to give her the money. He says, 'Mom, Helen would not give me my money, my will or my other important papers; she said they had burned; and don't give her the money unless she signs for it'. Which she would not.

"Q. Did your brother at that time ask Helen about these papers you are talking about?

"A. Yes. She said they all burned.

"Q. What did he say to her with reference to these papers?

"A. He said, 'Helen'—he said, 'I would like to have my will and my important papers', and Helen had said—she says, 'They all burned—the will and all your important papers and books,—everything burned'.

"Q. Did she have reference, if you know, to the fire that she had in her home?

"A. Yes."

In the testimony of Frank Kveder, husband of Virginia Kveder, the following appears:

"Q. Did Edward McCloskey ever say to you, after the fire that his sister had, what would happen to his possessions, that is, his property and so on, after he died? . . .

"A. At one time he was up there, and I took my mother-in-law and she drew up a will; after we had that drawn up there—well, at one time Ed came up, and she showed him the will she drew up; and after

he read the will over—and I was present at that time, and my wife was also present—he says, 'Well, Mom, if anything ever happens to me, everything I have will be yours'."

Appellant also adduced testimony that decedent had asked proponent to return his papers to him on several occasions before the fire in 1951 and proponent had refused.

Decedent died on January 8, 1954, leaving an estate of $12,000 in cash. After decedent's death, six members of the family, including appellant and proponent, met on January 9, 1954, at proponent's home with one Dumas, a funeral director, to make the arrangements for the funeral and burial. It is not denied that on this occasion, although the subject of the existence of a will was discussed, proponent, Helen Majzer, did not disclose that she was in possession of decedent's will. It is also an admitted fact in the case that appellant paid the funeral and burial expenses of decedent and has not been reimbursed. Proponent's testimony is that, at the time of the family conference with the funeral director, she was not aware of the fact that decedent's will was in her possession, that she had forgotten about it. Proponent testified as follows:

"Q. Did you ever tell your brother that the will had burned in the fire?

"A. No, sir.

"Q. Mrs. Majzer, when did you notify—if you did—the mother and brothers of this will?

"A. Well, Mr. Schauffler, I had completely forgotten about the will or the papers of any kind until Friday after Ed's funeral."

And on cross-examination as follows:

"Q. They all knew him? And at the time that these arrangements were being made with Mr. Dumas you didn't know that you had a will—

"A. No, I didn't.

"Q. Now, you had forgotten about that?

"A. Yes, I did, sir.

"Q. And even the fact of your brother's death didn't remind you of it?

"A. No, it didn't, sir.

"Q. And the proceeding for the arrangement of the funeral didn't remind you of it?

"A. No, it didn't.

"Q. And the funeral itself and the sight of your brother's body didn't remind you of it?

"A. No, it didn't."

Proponent also testified that at Christmastime of 1951, decedent asked her if she still had his will and other papers in her possession. She replied that she did have them and "he said, 'well, just leave them here' ". Proponent further testified that decedent never mentioned his will or other papers to her thereafter.

Decedent's will was probated before the Register of Wills of Allegheny County on February 3, 1954, and on the same date letters testamentary were granted to Helen Majzer, the named executrix. On October 7, 1954, Victoria McCloskey, mother of decedent, filed her appeal from the decree of probate. Thereafter pleadings sur appeal were filed and the case came on to be heard.

The first question to be determined is whether an issue should be awarded to try by jury the question whether revocation of the will of decedent was effected by the alleged fraudulent conduct of the proponent. Section 5 of the Wills Act of 1947 provides:

"Section 5. Revocation of a Will.—No will or codicil in writing, or any part thereof, can be revoked or altered otherwise than:

"(1) Will or Codicil. By some other will or codicil in writing,

"(2) Other Writing. By some other writing declaring the same, executed and proved in the manner required of wills, or

"(3) Act to the Document. By being burnt, torn, canceled, obliterated, or destroyed, with the intent and for the purpose of revocation, by the testator himself or by another person in his presence and by his express direction. If such act is done by any person other than the testator, the direction of the testator must be proved by the oaths or affirmations of two competent witnesses."

There is no evidence in the record to show that there was a revocation of decedent's will in accordance with any of the provisions of section 5 of the Wills Act of 1947. It is conceded that the writing is decedent's last will and testament and that it was properly executed. Not having been revoked in a manner authorized by the statute, it would appear that the writing was admissible to probate by the register. In Clingan v. Mitcheltree, 31 Pa. 25, it appeared that a testator who had given his will into the possession of his wife had, afterward, frequently made ineffectual searches for it with a view to destroying it and that his wife, the sole beneficiary therein, brought forth a paper alleging it to be his will and, in his presence, burnt it. He immediately declared this to be right. In an action of ejectment brought after his death by a sister claiming as an heir at law against the wife who claimed under the will, it was held that there had not been an effective revocation under the provisions of the Act of April 8, 1833, P. L. 249, which provided:

"That no will in writing concerning any real estate shall be repealed, nor shall any devise or direction therein be altered, otherwise than by some other will or codicil in writing, or other writing declaring the same executed, and proved in the same manner as is hereinbefore provided, or by burning, cancelling, or

obliterating or destroying the same by the testator himself, or by some one in his presence, and by his express direction".

In the opinion of the Supreme Court in the Clingan case it is held (Mr. Justice Knox):

"It is a well settled rule of law that actual fraud vitiates every species of contract, and annuls even the decrees and judgments of the highest courts of record. But is the principle applicable to the case before us? Conceding the competency and relevancy of the plaintiff's evidence, it establishes the fact that Mrs. Mitcheltree told her husband that she had burnt the will, when in truth she had not; that he was himself hunting for it to destroy it, and was satisfied with its destruction, although he had given no express direction to her to destroy it. Now, even if we should consider his subsequent assent to the supposed destruction as equivalent to an express direction, it would only prove an intention to revoke without actual revocation. But the direction, however express it may be, can never amount to a revocation unless it is followed by burning, cancelling, obliterating, or destroying, otherwise the great object of the statute, which was to prevent parol revocations, would be entirely unaccomplished. To comply with the statutory requisition of revocation by destroying, there must be some act of destruction, or towards destruction, done *animo revocandi*—mere words will not suffice."

See also Clark v. Morrison, 25 Pa. 453, 456; Gains v. Gains, 2 A. K. Marsh 190 (Ky.); Bohleber v. Rebstock, 255 Ill. 53, 99 N. E. 75. The general rule is stated in Page on Wills (3rd or Lifetime Ed., 1941), sec. 443, page 797, as follows:

"If the question (revocation) is presented in a proceeding to probate the will, the great weight of authority is that the will cannot be revoked by testator's intention alone, in the absence of the acts which are

required by statute to be manifest on the face of the will, no matter by what fraud or duress testator's intention has been prevented from manifesting itself upon the face of the will, by one of the requisite acts."

There is evidence in the case at bar that, prior to the fire in 1951, decedent asked proponent on several occasions to return his will and other papers and that she refused. Decedent knew that his will was being withheld from him by proponent. But there was no attempted revocation of the will by another writing executed in accordance with the Wills Act of 1947. Nor was the will burnt, torn, cancelled, obliterated or destroyed by the testator or by another in his presence and at his express direction. As held in Lewis v. Lewis, 2 W. & S. 455, 458 (Mr. Justice Sergeant) :

"Mere parol declarations by the testator, as to his intention of dying intestate, whether before or after the making of his will, are not admissible to show a revocation of it."

See also Clingan v. Mitcheltree, supra, p. 37.

In the case at bar the decree of probate is conclusive. The record presents no evidence upon which to award an issue to try the validity of the will. The appeal of Victoria McCloskey from the decree of probate will be dismissed.

At the conclusion of appellant's evidence in the case at bar, counsel for appellant requested leave to enlarge the prayer of her petition to ask that Helen Majzer, the proponent of the will, "be declared a trustee for the benefit of those persons who would have taken if the will had, in fact, been revoked. . . ." Appellant concedes that she is not entitled to the award of an issue on this question as a matter of right and that the determination of the question should be deferred until the time of the audit of the final account of the personal representative of decedent. Whether an issue should be framed and tried by a jury at a later time

is within the discretion of the court: Section 745(*d*) of the Orphans' Court Act of August 10, 1951, P. L. 1163. As held in Hoge v. Hoge, 1 Watts 163, 215 (Chief Justice Gibson):

". . . The trust insisted on here, however, owes its validity, not to the will or the declaration of the testator, but to the fraud of the devisee. It belongs to a class in which the trust arises *ex maleficio*, and in which equity turns the fraudulent procurer of the legal title into a trustee, to get at him; and there is nothing in reason or authority to forbid the raising of such a trust, from the surreptitious procurement of a devise."

See also Church v. Ruland, 64 Pa. 432, 442, 443.

The question of the constructive trust or unjust enrichment should be raised outside the probate proceeding: Brazil v. Silva, 181 Cal. 490, 185 Pac. 174, 175; Gains v. Gains, supra, p. 610. The orphans' court has power to determine whether a trust has been created as to a fund before it for distribution: Hoffner's Estate, 161 Pa. 331, 342. A summary of the law in A. L. I. Restatement of the Law of Restitution §184(*e*), is that:

"Where a testator is by fraud, duress or undue influence prevented from revoking his will, or from revoking a devise or bequest, by the person who takes the property under the will, he holds it upon a constructive trust for the person who would have taken if the will or devise or bequest had been revoked".

See also Danner et al. v. Danner, 366 Pa. 178, 180; Hoffner's Estate, supra, p. 341, 342; McAuley's Estate, 184 Pa. 124, 127, 130.

The question as to whether a constructive trust has been established in favor of Victoria McCloskey, the petitioner, will be reserved until the audit of the final account of the personal representative. Whether or not the question will be submitted to trial by jury will

be determined at that time if the estate proves to be solvent.

In the interim, the assets of the estate in the hands of the executrix should be secured by requiring her to file an adequate bond with corporate surety in the office of the register of wills. If the required security is not entered, the executrix should resign or be removed, with provision made for the appointment of an administrator.